**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **NORTHWESTERN MEMORIAL HOSPITAL,** ) | |
| ) | |
| ) | **No. 11 C 1811** |
| Plaintiff/Counterclaim Defendant, ) | |
| ) | **Judge Joan H. Lefkow** |
| v. ) | |
| ) | |
| **LAKE COUNTY BOARD OF COMMISSIONERS EMPLOYEE HEALTH BENEFIT PLAN,** ) | |
| ) | |
| Defendant/Counterclaim Plaintiff, and ) | |
| ) | |
| **FIRST HEALTH GROUP CORP.,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Northwestern Memorial Hospital ("Northwestern") filed a two-count amended complaint[1] against Lake County Board of Commissioners Employee Health Benefit Plan ("the Plan") and First Health Group Corporation ("First Health") claiming that the Plan improperly denied benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (count I), and that the Plan and First Health are liable for damages for breach of contract (count II). [Dkt. 13.] The Plan filed a counterclaim against Northwestern seeking, in count I, attorneys' fees under ERISA and, in count II, reimbursement for

---

[1] Northwestern initially filed a single count complaint against the Plan pursuant to ERISA. [Dkt. 1.] After obtaining leave of court [Dkt. 12], Northwestern filed an amended complaint, adding a claim for breach of contract arising under state law and adding First Health as a defendant. [Dkt. 13.]

overpayment of benefits.[2]  [Dkt. 19.]  The Plan and First Health have moved to dismiss count II of Northwestern's amended complaint [Dkts. 20, 28], and Northwestern has moved to dismiss the Plan's counterclaim.  [Dkt. 15.]  For the reasons that follow, the Plan and First Health's motions to dismiss will be granted, and Northwestern's motions to dismiss the Plan's counterclaim will be granted with leave to amend.

## BACKGROUND[3]

Northwestern is a not-for-profit hospital located in Chicago, Illinois.  (Am. Compl. ¶ 1.)  The Plan is an employee benefit plan organized pursuant to ERISA that provides medical benefits for eligible employees of Lake County, Indiana.  (*Id.* ¶¶ 2–3.)  First Health owns and operates a managed care organization.  (*Id.* ¶ 17.)  First Health entered into contracts with medical providers (such as hospitals) that agreed to provide health care at reduced rates to clients in First Health's network.  (*Id.* ¶¶ 17, 19.)  First Health's clients included employee benefit plans.  (*Id.*)

**Hospital Contract**

On or about September 16, 2004, Northwestern and First Health entered into a "Hospital Contract," at which time Northwestern became a "preferred provider" of medical services for First Health's clients.  (*Id.* ¶ 18.)  As a preferred provider, Northwestern agreed to accept pre-negotiated payments for medical services offered to patients covered by a health insurance plan in First Health's network.  (*Id.* ¶ 19.)  Sometime prior to August 26, 2008, the Plan joined First

---

[2] This court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1367.  Venue is proper under 29 U.S.C. § 1132(e)(2).

[3] For the purposes of the motions, the court takes as true all well-pleaded facts in the complaint and counterclaim and draws all reasonable inferences in the pleader's favor.  *See, e.g.*, *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977–78 (7th Cir. 1999).

Health's network, becoming a "preferred payor," meaning that Plan participants would receive the advantage of the lower reimbursement rates negotiated by First Health with providers. (*Id.* ¶ 20.)

"Payment Provisions" under Article 4 of the Hospital Contract detailed payment methods between Northwestern and payors such as the Plan. The billing procedures provide in relevant part:

> (a) The Contract Hospital shall bill the Payor in accordance with this Article for the provisions of Inpatient Services and Outpatient Services to Participants, and the Payor shall only be liable for the amounts provided for in Paragraph 4.2(b), less amounts from any applicable copayments, deductibles, and coordination of benefits as described in Paragraph 4.2(c).
>
> (d) Contract Hospital shall submit UB-92 billing forms, its successor billing forms or electronic equivalent, to the Payor which provide sufficient information to identify Inpatient Services and Outpatient Services provided, actual billed charges for such services and number of days Participants received such services.

(Hospital Contract ¶¶ 4.1(a), 4.1(d) (as amended)). The payor's obligations after receiving billing forms from Northwestern are these:

> (a) First Health's agreement with Payors shall require the Payor to pay Contract Hospital within 30 days of receipt of billing forms which are accurate, complete, and otherwise in accordance with this Article 4, unless otherwise required by law.
>
> (b) After there has been a submission of billing forms in accordance with Paragraph 4.1(d) of this Contract, the Contract Hospital shall be paid by the respective Payor at the [reduced] rates set forth in Appendix A. . . . Notwithstanding the above, Contract Hospital shall be entitled to full billed charge payment from Payors who are legally liable for payment of a claim when and if all of the following conditions apply to a specific claim:
>
>> 1) An accurate, complete claim has been submitted to Payor at the address listed in the "Payor Notice" provided to Contract Hospital by First Health; and
>>
>> 2) Payor has failed to pay Contract Hospital within sixty (60) days of receipt of the final UB-92 billing form which is complete, accurate

3

>> and otherwise in accordance with this Article 4, unless required by law.
>
> (c) Where the Payor, pursuant to applicable coordination of benefits law, is primary, the Payor shall be required to pay the amounts due under this Contract as provided in Paragraphs 4.2(a) and 4.2(b). Where the Payor is other than primary, the Payor shall be required to pay only those amounts which, when added to amounts owed to Contract Hospital from other sources, equal one hundred percent of the amount required by this Contract.

(Hospital Contract ¶4.2(a) (as amended); 4.2(b) (as amended); 4.2(c).[4]

**Patient AD's Treatment**

Patient AD[5] was a participant in or beneficiary of health insurance benefits under the Plan's terms. (Am. Compl. ¶ 6.) From August 26, 2008 until December 9, 2008, Patient AD received medical treatment at Northwestern, incurring medical charges totaling $863,377.15. (*Id*. ¶¶ 4, 9.) Patient AD subsequently assigned her rights and benefits under the Plan to Northwestern. (*Id*. ¶ 4.) This assignment authorized the Plan to pay Patient AD's benefits directly to Northwestern. (*Id*.) As assignee of Patient AD's rights, Northwestern was a participant or beneficiary as defined by ERISA. (*Id*. ¶ 8.)

Under Paragraph 4 of the Hospital Contract, Northwestern submitted a "clean claim" to the Plan listing the treatment dates and medical services provided in connection with Patient AD's care. (*Id*. ¶¶ 24–25.) The Plan forwarded the charges submitted by Northwestern ($863,377.15) to Professional Care Management ("PCM"), its third party administrator. (Counterclaim ¶ 3.) PCM obtained an initial audit, (*Id*. ¶¶ 5–6), and after making adjustments and exclusions, paid Northwestern $293,781.15. (*Id*. ¶ 7.) Northwestern, however, contended

---

[4] The Hospital Contract included an amendment to the agreement. The parties executed the Hospital Contract and the amendment on the same day.

[5] Patient AD's name is not disclosed to protect his/her privacy.

that the Plan owed $547,381.11, which was the negotiated rate under the terms of the Hospital Contract. (Am. Compl. ¶ 27.) Because the Plan failed to pay within the specified time period, Northwestern seeks its full rate, which amounts to an additional $535,430.22.[6] (*Id.* ¶ 29.)

**The Plan's Overpayment**

PCM obtained a second audit of all but $31,555.95 of Northwestern's charges. (Counterclaim ¶ 30.) According to that audit, the Plan determined that it owed Northwestern an additional $34,165.78. (*Id.*) The Plan next obtained an audit of the remaining $31,555.95 of Northwestern's charges and determined that it overpaid Northwestern by $5,202.95. (*Id.*) The Plan requested a refund of that amount; however, to date, Northwestern has not refunded the overpayment. (*Id.* ¶ 31.)

> The employee benefit plan addressed recovery of overpayments:
>
> In the event of any overpayment of benefits by this Plan, this Plan will have the right to recover the overpayment. If a Covered Person is paid a benefit greater than allowed in accordance with the provisions of this Plan, the Covered Person will be requested to refund the overpayment. If the refund is not received from the Covered Person, the amount of the overpayment will be deducted from future benefits. Similarly, if payment is made on the behalf of a Covered Person to a Hospital, Physician, or other provider of health care, and the payment is found to be an overpayment, the Plan will request a refund of the overpayment from the provider.

(Plan's Resp. to Northwestern's Mot., at 3) (Dkt. 27).[7]

**First Health's Obligation under the Hospital Contract**

Paragraph 4.2(e) authorizes First Health to collect outstanding amounts from payors:

---

[6] In paragraph 11 of the amended complaint and in its demand in count II, Northwestern provides that the total amount of its services was $534,430.22, or $1,000 less than the amount it specifies in paragraph 29 of the amended complaint.

[7] Although the Plan's response indicates that it attached the employee benefit plan as Exhibit A, this document was not included with the Plan's filing. The court thus relies on the Plan's response, which quotes directly from the written employee benefit plan.

> The Contract Hospital agrees and authorizes First Health, and any parent, affiliated or subsidiary entity of First Health, to collect such amounts as are due to Contract Hospital for health care services to Participants in accordance with this agreement and First Health agrees to immediately transfer payments received to Contract Hospital.

(Hospital Contract ¶4.2(e)).

In the event of a claimed breach, the Hospital Contract included paragraphs regarding "Dispute Resolution," which provide in relevant part:

> (a) First Health and the Contract Hospital agree to provide the other party with written notice of any alleged breach of this Contract. The notice shall include reasonable detail of the event(s) which constitute the alleged breach.
>
> (b) First Health and the Contract Hospital agree to meet and confer in good faith to resolve any problems, disputes, or issues of breach that may arise under this Contract.

(Hospital Contract ¶6.10). Other provisions of the Hospital Contract specifically dealing with overpayments and underpayments referenced the dispute resolution paragraphs and stated in relevant part that each side "may use the dispute resolution procedure set forth in Paragraph 6.10(b))." (Hospital Contract ¶¶4.3(a) (as amended), 4.3(b) (as amended)).

After the Plan failed to pay for the total medical charges incurred by Patient AD, Northwestern sent a demand letter to First Health pursuant to Paragraph 4.2(e) requesting that it collect the unpaid amount from the Plan. (*Id.* ¶ 31.) First Health, however, failed to collect from the Plan. (*Id.* ¶ 35.)

6

**LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page,* 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis, but must also establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp.* v. *Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly,* 550 U.S. at 555.

**ANALYSIS**

**I.     Count II of Northwestern's Amended Complaint Against the Plan**

The Plan argues that Northwestern's breach of contract claim is completely preempted by ERISA because it is simply a claim for benefits under § 502(a) clothed in breach of contract terms. Northwestern contends that the Hospital Contract is a separate agreement arising outside the contours of Patient AD's rights under the Plan and is thus not preempted by ERISA.

"The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health, Inc.* v. *Davila*, 542 U.S. 200, 208, 124 S. Ct. 2488, 159 L. Ed. 2d 312

(2004). Accordingly, claims within the scope of ERISA § 502[8] are completely preempted. *Metro Life Ins. Co.* v. *Taylor*, 481 U.S. 58, 66, 107 S. Ct.1542, 95 L. Ed. 2d 55 (1987). Preemption in this context means simply that federal law governs. *See Lehmann* v. *Brown,* 230 F.3d 916, 919-920 (7th Cir. 2000) ("State law is 'completely preempted' in the sense that it has been replaced by federal law–but this happens because federal law takes over all similar claims, not because there is a preemption defense."); *Jass* v. *Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1490 (7th Cir. 1996) (A cause of action that is completely preempted by § 502 is transformed into "an action arising under federal law.") (internal quotation marks omitted).

In *Davila*, the Supreme Court articulated a two-part test to determine whether ERISA completely preempts a state law cause of action:

> [I]f an individual brings suit complaining of a denial of coverage for medical care, where the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated, then the suit falls 'within the scope of' ERISA § 502(a)(1)(B). . . . In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely pre-empted by ERISA § 502(a)(1)(B).

*Franciscan Skemp Healthcare, Inc.* v. *Cent. States Joint Bd. of Health & Welfare Trust Fund*, 538 F.3d 594, 597 (7th Cir. 2008) (quoting *Davila*, 542 U.S. at 210). Under the *Davila* test, Northwestern's breach of contract claim is completely preempted if (1) Northwestern could have brought its claim pursuant to ERISA § 502(a)(1)(B); and (2) the Plan did not violate any other independent legal duty apart from those imposed by ERISA. *Id.*

---

[8] Section 502, ERISA's enforcement provision, provides in relevant part that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B).

First, not only could Northwestern have brought its claim under § 502(a)(1)(B), it did so in count I by suing as assignee of Patient AD. The facts alleged in Northwestern's breach of contract claim in count II mirror the allegations in count I. As such, the breach of contract claim falls squarely within § 502(a)(1)(B). *See, e.g., Vallone* v. *CNA Fin. Corp.*, 375 F.3d 623, 638 (7th Cir. 2004) ("[C]laims by a beneficiary for wrongful denial of benefits (no matter how they are styled) have been held by the Supreme Court to 'fall [] directly under § 502(a)(1)(B) of ERISA, which provides an exclusive federal cause of action for resolution of such disputes.'") (quoting *Taylor*, 481 U.S. at 62–63).

Second, the Hospital Contract did not place a separate legal duty on the Plan to reimburse Northwestern for Patient AD's medical treatment. Northwestern argues that the breach of the Hospital Contract gives it an independent right to payment from the Plan. Under the Hospital Contract, however, liability exists only where the Plan covered Patient AD's medical services and the Plan nonetheless refused to pay for the treatment. The Hospital Contract does not impose additional liability on the Plan to pay for services not covered by the employee benefit plan.[9] The employee benefit plan, not the Hospital Contract, thus dictates whether the Plan is liable to Northwestern for Patient AD's denied coverage. *See Davila*, 542 U.S. at 213 (holding that no independent legal duty existed as "liability would exist here only because of petitioners' administration of ERISA-regulated benefit plans."); *Klassy* v. *Physicians Plus Inc.*, 371 F.3d 952, 956 (7th Cir. 2004) (ERISA completely preempted the plaintiffs' state law malpractice

---

[9] Rather, the Hospital Contract imposes liability on participants for that amount. *See* Hospital Contract ¶4.1(b) (as amended) ("Contract Hospital agrees that the only charges for which a Participant may be liable and be billed by Contract Hospital shall be for hospital non-covered services and for copayments and deductible amounts required by the Health Plan.")

9

claim "because the sole issue was one of eligibility");[10] *Vanderwiel* v. *Schawk USA, Inc.*, No. 12 CV 4178, 2012 WL 3779040, at *3 (N.D. Ill. Aug. 30, 2012) ("the alleged legal duty owed to [the plaintiff] cannot be decided without reference to plan documents and is not independent of an ERISA eligible plan"). Accordingly, the court concludes that ERISA completely preempts Northwestern's breach of contract claim. The motion to dismiss Count II against the Plan will be granted.

## II. Count II of Northwestern's Amended Complaint as to First Health

First Health also moves to dismiss count II, contending that it had no duty to pay for or collect the unpaid amounts for Patient AD's medical services. First Health does not argue for ERISA preemption. Rather, First Health focuses on the terms of the Hospital Contract and contends that it never breached that agreement. Northwestern, however, argues that the Hospital Contract obligated First Health to pay for or collect the unpaid amounts from the Plan. The Hospital Contract is governed by Illinois law. (Hospital Contract ¶6.3.)[11] Under Illinois law, a plaintiff alleging breach of contract must establish "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *TAS Distrib. Co.,* v. *Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir.

---

[10] In *Klassy*, decided before *Davila*, the Seventh Circuit used a different test in deciding whether a state law cause of action was completely preempted. Still, the Seventh Circuit subsequently noted that the result under the *Davila* test would be the same as the *Jass* test. *Franciscan Skemp Healthcare, Inc.*, 538 F.3d at 597 n.1.

[11] Northwestern did not attach the Hospital Contract to its amended complaint. Still, this court will consider the Hospital Contract in ruling on First Health's motion to dismiss, as Northwestern's breach of contract claim is predicated on a breach of the Hospital Contract. *Wright* v. *Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.").

2007) (internal quotation marks omitted). Northwestern's complaint alleges the first two elements, the existence of a contract and that it provided medical services to Patient AD at a reduced rate pursuant to that contract. (Am. Compl. ¶¶ 18, 34.)

Northwestern contends that First Health breached the Hospital Contract by failing to pay Northwestern or collect the unpaid amount for Patient AD's medical services from the Plan. (Am. Compl. ¶¶ 30–31, 35.) First Health argues that it never had an affirmative duty to pay Northwestern or request payment from the Plan. In construing a contract, a court's role "is to give effect to the parties' intent as expressed in the terms of their written agreement." *Lewitton* v. *ITA Software, Inc.*, 585 F.3d 377, 379 (7th Cir. 2009). Neither party contends that the contract is ambiguous, so the "four corners rule" applies. *See Home Ins. Co.* v. *Chicago & Northwestern Trans. Co.*, 56 F.3d 763, 767 (7th Cir. 1995) ("This so called four-corners rule holds that if a contract is clear on its face and the text contains no clue that the contract might mean something different from what it says, then the inquiry is over—no evidence outside of the contract may be considered.").

The payment provisions in Article 4 set forth the billing and payment procedure between Northwestern and payors such as the Plan. Northwestern bills payors directly (Hospital Contract ¶¶4.1(a), 4.1(d)), which in turn obligates the payor to remit payment to Northwestern. (*Id.* ¶¶4.2(a), 4.2(b), 4.2(c)). None of these provisions references an obligation by First Health to pay Northwestern; rather, the contract places the burden of payment on the payor, *i.e.*, the Plan. These paragraphs provide in relevant part:

> First Health's agreement with Payors shall require the Payor to pay Contract Hospital within 30 days of receipt of billing forms . . . [(*Id.* ¶4.2(a))].

> After there has been a submission of billing forms in accordance with Paragraph 4.1(d) of this Contract, the Contract Hospital shall be paid by the respective Payor . . . [(*Id*. ¶4.2(b))].
>
> Where the Payor, pursuant to applicable coordination of benefits law, is primary, the Payor shall be required to pay the amounts due under this Contract as provided in Paragraphs 4.2(a) and 4.2(b). [(*Id*. ¶4.2(c))].

The plain terms of the Hospital Contract are thus clear that First Health did not have a duty to pay for Patient AD's medical services.

Northwestern further argues that once Northwestern asked First Health to use its authority under Paragraph 4.2(e) to collect from the Plan, Paragraph 6.10 obligated it to work in good faith to resolve the (claimed) breach of contract by collecting from the Plan. First Health's failure to do so, Northwestern alleges, was a breach. (Otherwise, Northwestern argues, Paragraph 4.2(e) is "rendered meaningless.") (Northwestern's Resp. to First Health's Mot., 2) (Dkt 33).

Northwestern implicitly (and correctly) concedes that the contract does not explicitly require First Health to collect from the Plan. Paragraph 4.2(e) does indeed authorize First Health to collect past due amounts from delinquent payors:

> The Contract Hospital agrees and authorizes First Health, and any parent, affiliated or subsidiary entity of First Health, to collect such amounts as are due to Contract Hospital for health care services to Participants in accordance with this agreement and First Health agrees to immediately transfer payments received to Contract Hospital.

(Hospital Contract ¶4.2(e)). The straightforward meaning of this term is that it authorized but did not require First Health to demand payments from truant payors. This interpretation is reinforced because certain provisions of the Hospital Contract employed the term "shall" (defined by the agreement as "a mandatory term or function") (Hospital Contract ¶2.9), whereas

12

Paragraph 4.2(e) did not. For example, in the payment provisions, the parties used the term "shall" requiring the payor to pay Northwestern after receiving billing forms. (Hospital Contract ¶¶4.2(a), 4.2(b), 4.2(c)). Although the Hospital Contract did not define "authorize," "a contract term is not ambiguous merely because it is undefined in a contract." *Chapman* v. *Engel*, 865 N.E.2d 330, 333, 372 Ill. App. 3d 84, 310 Ill. Dec. 6 (Ill. App. Ct. 2007). Black's Law Dictionary defines authorize to mean "[t]o give legal authority" or "to empower," and does not equate the term with a mandate. BLACK'S LAW DICTIONARY 153 (9TH ED. 2009). In connection with that definition and the parties' omission of an affirmative duty in Paragraph 4.2(e), the court concludes that the Hospital Contract unambiguously permitted but did not require First Health to collect unpaid amounts from payors such as the Plan.

Northwestern derives First Health's obligation to collect from Paragraph 6.10(b)'s "Dispute Resolution" provision, which it argues First Health breached by doing "nothing" when Northwestern requested that it collect the unpaid amounts from the Plan. Paragraph 6.10(b) provides in relevant part that "First Health and the Contract Hospital agree to meet and confer in good faith to resolve any problems, disputes, or issues of breach that may arise under this Contract." (Hospital Contract ¶6.10(b)). Northwestern never referenced Paragraph 6.10(b) in its amended complaint, nor did it allege that violation of Paragraph 6.10(b) also gave rise to a breach. Neither does it cite any authority that a failure to meet and confer in pursuit of dispute resolution has been held to be a material breach of contract.

Moreover, similar to the discussion of Paragraph 4.2(e) above, the omission of reference to Paragraph 6.10 in Paragraph 4.2(e), contrasted to specific references to it in other provisions of the Hospital Contract, suggests that First Health did not incur the obligation Northwestern

13

urges. Paragraphs 4.3(a) and 4.3(b), for example, which allow for recovery of overpayments and underpayments, specifically refer to Paragraph 6.10(b) in the event that the parties dispute the propriety of payments under these provisions. This permits the inference, at the very least, that failure to comply with Paragraph 6.10(b) is not a material breach in this context. Accordingly, the pleaded facts do not permit the inference that First Health breached the Hospital Contract.[12]

### III.     Northwestern's Motion to Dismiss the Plan's Counterclaim

Northwestern moves to dismiss count II of the Plan's counterclaim stating that the Plan cannot seek return for the overpayments it made to Northwestern because there is no contract between Northwestern and the Plan requiring it.[13] The Plan argues in response that it is entitled to recover these overpayments because, under the terms of the Plan, Patient AD, Northwestern's assignor, agreed to refund overpayments.

Courts have subject matter jurisdiction over claims properly brought pursuant to ERISA § 502(a)(3)(B). *Trustmark Life Ins. Co.* v. *Univ. of Chicago Hosp.*, 207 F.3d 876, 880–81 (7th Cir. 2000). Section 502(a)(3)(B) states that ERISA fiduciaries can bring claims for equitable relief to enforce the terms of an employee benefit plan:

> A civil action may be brought by a participant, beneficiary, or fiduciary . . . (B) to obtain other appropriate equitable relief to (i) to address such violation or (ii) to enforce any provisions of this subchapter or the terms of the Plan.

---

[12] Northwestern's argument that Paragraph 4.2(e) is meaningless unless it imposes an obligation on First Health to collect does not acknowledge that First Health would need contractual authority to act on a payee's behalf should it decide to do so.

[13] Northwestern moves to dismiss the Plan's counterclaim pursuant to Federal Rule of Civil Procedure 41, which allows the Plan to voluntarily dismiss its counterclaim before a responsive pleading is served. This rule does not apply here as Northwestern seeks to dismiss the Plan's counterclaim.

29 U.S.C. § 1132(a)(3)(B); *see, e.g., Cent. States, Se. & Sw. Areas Health & Welfare Fund* v. *Neurobehavioral Associates, P.A.*, 53 F.3d 172, 173 (7th Cir. 1995) ("[the plaintiff's] lawsuit falls easily within [§ 502(a)(3)(B)]" in that "it is an action seeking equitable relief (restitution) which seeks to redress a violation the plan and to enforce the recovery of the overpayment portion of its plan.").

  The Plan's counterclaim is so poorly pleaded, however, that it is difficult to discern the basis of its claim. The Plan alleges that it is an employee benefit plan created under ERISA and that Northwestern provided medical care to Patient AD. It alleges that overpayments were made to Northwestern on Patient AD's behalf. The Plan does not allege that Patient AD was a participant in or beneficiary of the Plan, that Patient AD or Northwestern agreed to refund overpayments to the Plan, or that Patient AD assigned her rights and obligations under the Plan to Northwestern, resulting in Northwestern's having an obligation to the Plan. Neither does the Plan allege the basis of the court's jurisdiction which, in light of the nature of the Plan's claim, is presumably section 502(a)(3)(B) for equitable relief rather than this court's supplemental jurisdiction. *See* Fed. R. Civ. P. 8 (requiring that the court's jurisdiction be alleged); 28 U.S.C. §1367.[14] Accordingly, Northwestern's motion to dismiss the Plan's counterclaim is

---

[14] In addition to ERISA § 502(a)(3)(B), the federal common law may provide the Plan with a theory of recovery. In developing the federal common law of ERISA, the Seventh Circuit recognized claims for restitution even though ERISA does not specifically provide for such relief. *See, e.g., Cent. States, Se. & Sw. Areas Health & Welfare Fund* v. *Pathology Labs. of Ark.*, 71 F.3d 1251, 1254 (7th Cir. 1995) ("Restitution by pension and welfare funds is governed by federal common law in the shadow of ERISA."); *UIU Severance Pay Trust Fund* v. *Local Union No. 18-U, United Steel Workers*, 998 F.2d 509, 512 (7th Cir. 1993) ("The Union seeks to assert what would be, under state law, a claim for restitution. Several district judges in this circuit as well as other courts of appeals have concluded that ERISA permits such a cause of action."). In *Harris Trust and Savings Bank* v. *Provident Life and Accident Insurance Company*, 57 F.3d 608, 615 (7th Cir. 1995), the Seventh Circuit held that an ERISA plan administrator could recover under a restitution theory in addition to ERISA § 502(a)(3)(B) to recoup benefits that its

(continued...)

granted without prejudice. The Plan is given leave to amend its pleading consistent with this Opinion.[15]

## CONCLUSION

The Plan's motion to dismiss Northwestern's breach of contract claim (count II) of the second amended complaint [Dkt. 20] is granted. First Health's motion to dismiss Northwestern's breach of contract claim (count II) of the second amended complaint [Dkt. 28] is granted. Northwestern's motion to dismiss Count II of the Fund's counterclaim [Dkt. 15] is granted without prejudice and the Plan is given leave to amend its counterclaim on or before November 15, 2012. A status hearing will be held on December 6, 2012, at 8:30 a.m.

Dated: November 6, 2012              Enter: _____
                                            JOAN HUMPHREY LEFKOW
                                            United States District Judge

---

[14](...continued)
beneficiary received from a third party. *Id*. The Seventh Circuit set forth the necessary elements noting that "[r]estitution is available [] only when one party has been enriched at another's expense" requiring that a party demonstrate: "(1) [it] had a reasonable expectation of payment, (2) the [plaintiffs] should reasonably have expected to pay, or (3) society's reasonable expectations of person and property would be defeated by non-payment." *Id*. (brackets in original) (quotation marks omitted). Again, the Plan did not specify whether it was relying on restitution under federal common law to recover the overpayments. Nor did it plead the specific elements required to substantiate such a claim.

[15] Northwestern argues that the Plan was not entitled to attorneys' fees, a claim addressed in count I of the counterclaim. The Plan points out that Northwestern's motion is directed at count II but not count I. If the Plan chooses to replead its counterclaim, and if it is claiming entitlement to attorney's fees as a prevailing party under ERISA, it will be sufficient to seek fees in the prayer for relief without alleging a separate claim.